The Honorable Judges of the United States Court of Appeals, in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention. The Court is now sitting. God save the United States and this Honorable Court. Good morning everyone. Welcome. Our first case this morning is Sugarloaf Fund v. Commissioner of Internal Revenue. Mr. Rogers. Good morning, Your Honors. My name is John Rogers. I represent Sugarloaf in this matter. Sugarloaf is taking a basic position that it is not a sham in 2006 through 2008, and it's doing so on the basis that it materially changed its membership, its management, its Other issues that result are who gets taxed, if anybody, on deposits into investor trusts, whether Mr. Rogers had self-employment income from Sugarloaf, and that Sugarloaf is inherently profitable. Mr. Rogers, can I ask you a question about your lead point to try to understand something? I'll put the question a couple of different ways. I think you'll follow it and you can respond. Are you acknowledging that the Sugarloaf partnership was a sham before the roll-ups? Let me just start there. No, Your Honor, but the courts have held, so what can I say? Right, so you're kind of stuck with that. Yes. Okay. So how then did the roll-ups affect things? Because what I understand, you can correct me if I'm wrong, that the roll-ups had the effect of the trading companies and the holding companies and their members effectively becoming owners, if you will, of the interest in the Sugarloaf partnership, right? That's correct. Okay. So that's just descriptive of what a roll-up is. Yes. But how does the fact that the roll-up occurred, given that the underlying business activity, at least as I read the papers here, it wasn't changing with respect to Sugarloaf. In other words, there's no return to investors in this six, seven, eight year. So given that those facts aren't changing, what changed is the roll-up occurred. How does the roll-up take us from a sham circumstance to a non-sham circumstance? Well, Your Honor, in the sham circumstance, the courts have held that Jetstream Business Limited was the only owner of Sugarloaf. Right. Jetstream was your company. That's correct. Right. And what happened with the roll-ups is that we brought in more members to be partners so that it became a partnership with members other than Sugarloaf. And there was no deduction for extreme bad debt losses at the Sugarloaf level. But how does the fact that there are new partners coming in alone, in your view, is that transformative? In other words, does that completely clean the kind of sham status? Because that's the part that confuses me a bit. I say, all right, I understand your point that the ownership structure is kind of a structural and formal matter. That changed. Yes. But Sugarloaf was what it was before and after with respect to its business operations or lack thereof, returns to investors, et cetera. Yes, Your Honor. I'm not taking the position that the addition of additional partners by itself transformed Sugarloaf. I'm saying that we changed the management, we changed the collection procedures, and we got into joint ventures with other collection companies, and those made profits. Okay. All right. I understand that. So then what you have to do, then you have to take on the tax court's findings, right, that there were really no legitimate business affairs that were being conducted by the partnership in 6, 7, and 8. Yes.  That's the real challenge you face. All I can say is that Sugarloaf collected on receivables. There were 60 people working on the trading floor, and the trading floor was a whole floor of an office building in downtown Sao Paulo. We had a manager who was embezzling, so we got rid of him, and that helped profitability improve. We brought in new techniques for collections. Specifically, we did protestados, which is a mass lawsuit in Brazil, which the government sponsors to go after delinquent note holders or debtors, and we emphasized collection of frauds, and frauds are checks that were written, bad checks that were written on bank accounts, opened by the banks by fraudsters, and once the bank did that, it got tagged with liability for the principal and the interest on the money. So that we had Mr. Gable, the company accountant, I had him go to Brazil in 2005, and he gave a lengthy report of his findings on the operations of Sugarloaf in the Kennett case. And if you go to... Supplement A, we start with a request for funds that went beyond the realm of reason. Are you talking about this chart thing? No, it's page 32. All right, well, keep going. I'm looking at what I think is page 32, and it's like a... No, it's after that. All right, keep going. Okay, so that was the beginning of the end in terms of getting rid of the embezzlers to enhance the profitability. Mr. Rogers, we really need you in front of the microphone because it's recording. Oh, I'm sorry, Your Honor. Sure, sure. But his testimony is in the record, and it's quite extensive. That's one of the reasons we brought Kennett into the record, was so that we wouldn't have to reintroduce all of these exhibits. The new management was particularly effective in transforming the company. We brought in two fund managers experienced. One was an American, Gary Smirhall. The other one was a Brazilian-American by the name of Henry Dunphy. Henry Dunphy had a large collection company of his own, and he was recommended to us by IBM Brazil. Henry was experienced in all of the new collection techniques, and in the record it shows collections in the appendix. It shows collections by year, and you see them improving from 2003 to 4, to 5, to 6. Strugolov has had a bad rap here. Specifically, the judges have felt like the collection activities were just window dressing when they weren't. I undertook these activities in 2005 and 2006, and that was long before the IRS ever said it was going to audit Strugolov. It was certainly long before the 2009 Superior Trading case. I put my own personal money behind it and my time for nine years trying to make an effective, profitable business where I would have a substantial ownership position. I think there's another factor here, and that is that Strugolov had profitable tax returns for three out of five years, at least, maybe more out of five. Under Section 183 of the code, an entity achieving that result is considered to be, presumed to be, operated for profit. That's at page two of my reply brief, down at the bottom. And, I mean, it isn't just something that I'm arguing. It's a statute that says, and the regulations say, if you do this, you're presumed to be operated for profit. And with respect to nobody getting any money, Strugolov generated cash flow, which at the beginning of 2006, it invested in a joint venture with another collection agency and a bank to go after the delinquent notes held by the bank and collect on them. That was $407,000 went into that joint venture, and it generated profits, dividends, et cetera. That money could as well have been paid out to the members of Strugolov, but that wasn't consistent with Strugolov's long-term goal of building a business, and it was in a growth mode so that cash was maintained in the business. Secondly, we brought in new, fresh partners, namely Teviot, Citco, and Barnard, and they brought in approximately $500,000 of new cash, which was used for Strugolov and its operations. The Citco application for membership is found at the very first exhibit in Petitioner's Supplement A. Those were fresh capital. They didn't have any taint of being involved with prior iterations of Strugolov. They came in without tax benefits, Brazilian investors, and joined in Strugolov. And as a percentage of Strugolov, I believe that their percentage ownership was equivalent to 10% of the overall capital of Strugolov, such that it was an arm's-length substantial transaction recognized in case law under the U.S. Steel case in the Second Circuit under Section 482 standards. Lastly, Mr. Rogers takes only through PPI. Mr. Rogers was invested in PPI, and PPI owned Jetstream. Jetstream only owned two-tenths of a percent of Strugolov, so that I believe it is total. Hold on. Before or after the roll-ups? After. Before it was 99%, wasn't it? No. I believe it was 0.2% before. Who held the other interests? Globex, a retailer who contributed notes, PDA, another public retailer who contributed notes, and one other in Iroquois, Warwick, left over from the superior trading case days. They were just there. When you say that you take only through PPI, I don't know if that's your way of asking the court to wade into and perhaps resolve questions relating to your own tax returns for the years in question. I'll just say for my part, I think that issues with respect to your own returns, I just see as outside the scope of this. I agree, Your Honor. This is a partnership case, and only partnership-level issues are at issue. There are passages in your briefs, though, where you're talking about income or lack thereof to yourself as an individual taxpayer. We'll see what he says, but the government has underscored, and that seems correct to me, that this case is about and only about Sugar Loaf. That's correct, Your Honor. But the thing is, we have the partnership case, and we have partnership issues. Sugar Loaf's position is that issues that go on Sugar Loaf's K-1 or affect individuals through the partnership case are still covered by the scope of the TEFRA partnership rules. I'll give you two examples. One is that the court said that investor deposits into their investor trusts were income to Sugar Loaf and bypassed the trust. Secondly, that the Sugar Loaf income was income to Rogers, and we take exception with that. The judge put that in his partnership opinion, and I think that that's incorrect because if Sugar Loaf is a sham, you need a trade or business to generate self-employment income, and that's saying you didn't have a trade or business. We're saying we had a trade or business, but that the self-employment income that might be generated thereby is barred by PPI Rogers holding being an S-corp. S-corps bar self-employment income, and that's a substantial issue. I think perhaps I should stop and leave some time for rebuttal. That's fine. May it please the court. Jeff Klim is for the commissioner. The record developed at trial fully supports the three central conclusions reached by the tax court at our issue on appeal. First, the 2006-2008 iteration of Sugar Loaf, like the 2004-2005 iteration, was not a bona fide partnership where it continued to market the same tax shelter using the same distressed receivables without ever receiving any collection proceeds or making distributions to investors. Second, Sugar Loaf's 2006-2008 income, like its 2004-2005 income, was allocable to its true owner, Jetstream, where Sugar Loaf failed to establish that it added any additional members during the years at issue. And finally, because Sugar Loaf never intended to actually engage in the debt collection business, it was not entitled to deduct expenses incurred in support of such a business, which it failed to substantiate in any event. We think that the starting point for the analysis of whether this was actually a bona fide partnership is what it is that Sugar Loaf was trying to collect, what it was that was central to its debt collection business. And these were consumer receivables that, at the time they were required in 2004, were already on average three to seven years past due and became years and years additionally past due in the years at issue. The government submitted the expert opinions of two witnesses that said that these receivables were never likely to be collected on a profitable basis. Sugar Loaf chose not to cross-examine those witnesses, chose not to retain or call an expert of its own. And those expert opinions were borne out in reality. Both Mr. Greer, who was a U.S. investor in Sugar Loaf, and Mr. Rogers testified, and this is a trial transcript pages 76 and 77 and 297 to 300. They testified that there were no collection proceeds ever remitted to Sugar Loaf. The receivables were never collected on a profitable basis. The expenses of collection were always at least equal to the revenue that was brought in, to the extent that there was any revenue. So there's no change in substance. We have some superficial changes in form, but no change in substance from the state of affairs described in our prior opinion. That's correct, Your Honor, yes. And Mr. Rogers has pointed to Sugar Loaf's tax returns and said, well, the tax returns on the whole are showing income in excess of expenses. That is true, but we'd like to walk through what that actually means in practice. None of these amounts are actually collection proceeds. Sugar Loaf's debt collection business or purported business was never turning a profit. And so when we look at Section 183D, it talks about the gross income derived from an activity exceeding the deductions attributable to such activity. The debt collection activity was never profitable. Sugar Loaf's marking of tax shelters was profitable. That is the profit that's showing up on the returns. And just looking at the different years that are at issue, in 2006, this is addressed at the third supplemental stipulations of fact, paragraph 229. The only substantial income that's coming in that's over $100,000 is $600,000 from something called SLF Limited, which we understand is Sugar Loaf Investmentos Limitada, which at transcript page 173 is identified as a wholly owned subsidiary of Sugar Loaf. This is not collection proceeds. In 2007, third supplemental stipulations of fact, paragraph 233, there are half a million dollars of trust distributions, which are not collection proceeds. There's also identified $1 million of accrued multi-cred collection. Accrued but not received, which means that to the extent this is a real number at all, it was never turned over to Sugar Loaf because it was always eaten up by the collection expenses, assuming that it was collected at all. And this is confirmed by the testimony of Mr. Greer and Mr. Rogers, saying no money actually came into Sugar Loaf from collection proceeds. 2008 is addressed at the fourth supplemental stipulations of fact, paragraphs 282 and 283. Again, we have $1 million of accrued but not received multi-cred collection. There's a $1.9 million sale of something called Sugar Loaf International, which is another shelter that Sugar Loaf was promoting. And then there's accounting adjustments, mark-to-market adjustments. This is not money coming in or going out of Sugar Loaf. These are bookkeeping entries. Sugar Loaf also points to 2009 and 2010. And candidly, the returns show substantial gross receipts in those years as they were filed. This is addressed in the second supplemental stipulations of fact, paragraphs 107 and 110. In 2009, Sugar Loaf reported $9.9 million of gross receipts. It stipulated in paragraph 107 that the actual amount of gross receipts was zero, not $9.9 million. No money came into Sugar Loaf in 2009. Similarly, in 2010, Sugar Loaf reported $900,000 of gross receipts, but stipulated in paragraph 110 that the actual amount of gross receipts for Sugar Loaf in 2010 was again zero, that these numbers on the returns are not accurate. It's unfortunate that Sugar Loaf is now pointing to those numbers after having stipulated that they are wrong. Let me just make sure I know. So the tax returns reflect accrual accounting, not cash-based accounting? Sugar Loaf was a cash-based taxpayer. There are numbers that are reflected on those returns that are accruals and should not have been reported on there. And at least for 2008, in stipulation for supplemental stipulations of fact, paragraph 282, 283, Sugar Loaf concedes that the accruals should not have been put on the return. Sugar Loaf tried to convert from the cash basis of accounting to the accrual basis without seeking prior permission. There were ultimately stipulations to the fact that Sugar Loaf was a cash basis taxpayer for all of the years at issue. In the third supplemental stipulations of fact, paragraphs 137 and 142, Sugar Loaf stipulated that it was a cash basis taxpayer in 2006-2007, and in the fourth supplemental stipulations of fact, paragraph 281, Sugar Loaf stipulated that notwithstanding that it tried to convert to an accrual basis taxpayer, that it remained, in fact, a cash basis taxpayer. We would note as well that Sugar Loaf's books and records were in disarray, where it was issuing well over 200 percent of partnership interest to various investors. Where there's conflicting evidence regarding who was admitted as a partner, when they were admitted as a partner, and often no documentation at all regarding what interest that they actually acquired in Sugar Loaf, in terms of profits, losses, or capital. Moreover, the transactions that Sugar Loaf was engaging in, in 2006-2008, were the same transactions it was engaging in in 2004 and 2005. The same distrust asset trust transactions, using the same foreign documents, money being deposited into the same bank accounts. Sugar Loaf has suggested in its briefing that it switched to a trust structure because there was some necessity to protect the assets from creditors or other entities that Sugar Loaf was working with. In the Kenneth Trading Tax Court opinion, footnote three in the surrounding text, the explanation for why Sugar Loaf switched from using LLCs, holding companies and trading companies, to using a trust structure, was because Congress actually passed a law saying that, with regard to partnerships and LLCs that were treated as partnerships, this tax shelter would fail as a matter of law. Sugar Loaf changed to a trust structure as opposed to a holding company LLC structure because it had to do that in order to try to keep marketing this tax shelter. That's the reason why this happened. And Mr. Rogers continued to be in complete control of Sugar Loaf in 2006-2008, just as he was in prior years. So is your main point that there may have been, with respect to the roll-up or the roll-ups, there may have been a roll-up, but the roll-up changed nothing? That's our central contention, correct, that there were no economic consequences to the roll-up, where there were never any distributions made to investors, where there were never any collection proceeds ever turned over to Sugar Loaf that could have even been the source of such distributions. And even looking at the purported roll-ups, there's no documents that identify what interest these purported new members would have had in Sugar Loaf's profits, losses, and capital. Yeah, if memory serves, the tax court had some real reservations with whether the roll-ups were even properly effectuated, right, whether they were even legitimate to begin with. That's correct. We think that that's a valid point, that there are concerns about whether these were legally effective in the first instance because they are substantially affecting the rights of these putative investors, that there's no prior notice given to them, that there are certain issues along those lines, that they're actually depriving these investors of certain rights. But we think that the bigger issue, that the more central issue, is that there was just no change of economic substance, that even if this was done on paper, even if it does check all the boxes legally, there was no actual effect, beyond the differing tax treaty. And we would also note that the investors in Sugar Loaf were seeking tax benefits. That was their predominant purpose and, in fact, their only purpose in joining into Sugar Loaf. And, in fact, there were points in time at which those tax benefits become – actually are at odds with Sugar Loaf's purported business purpose. So when Sugar Loaf was affecting these roll-ups, it said that it was very important that all the distressed debt be brought back into Sugar Loaf so it could affect a bulk sale or an IPO or something along those lines. But at the same time that Sugar Loaf is saying we have to get these receivables back, we have to pull distressed assets back into Sugar Loaf, it was dispersing out distressed debt to new U.S. investors. At the same time that it's saying we have a business purpose, it is working across purposes for the sole reason of tax benefits. In terms of the ownership structure of Sugar Loaf, the starting point for that analysis is what the tax court concluded in Kennett Trading and this court affirmed in the first Sugar Loaf opinion, which is that at the end of 2004-2005, the only owner of Sugar Loaf is Jetstream. Now, there's two categories of additional putative owners that Sugar Loaf has identified. There's the rolled-up investors and then there are also the series of entities. There's Globex, Warwick, Teviat, Bernard, Citgo. That latter category, each and every single one of those potential partners was identified on Sugar Loaf's books and records as being a partner in 2004 and 2005. Sugar Loaf argued in Kennett Trading that they were partners in 2004 and 2005. The court rejected that position. There is nothing that changed in form or in substance that made these purported partners into real partners when they were not real partners in the prior years. Let me make sure. I just want to translate that a little bit. So your point is Jetstream is the exclusive or supermajority holder of the full interest in Sugar Loaf? That's correct. During the tax years in question? Correct. And PPI, Mr. Rogers' firm, is the sole owner of Jetstream? Correct. And Mr. Rogers sits above PPI? Correct. Okay. And then we've already addressed the rolled-up partners that we don't think there was any substance, and there are questions about even the legality of the form and whether that form was actually effectuated in terms of the documentation of the rolled-ups. But we would emphasize that nothing changed from 2004 to 2005 to these other years to make these other entities, Globex, Warwick, Tevyeff, Bernard, Citgo, into partners when in fact they were not partners in 2004 and 2005. The issue then is one of income allocation. Since Jetstream is, in fact, the only owner of Sugar Loaf, then all the income of Sugar Loaf is allocated to its sole owner, Jetstream. The deposits into investor trust accounts. Again, the reason why we're using a trust structure instead of an LLC structure is because of the change in the law. In Kennett Trading, Sugar Loaf 1, the court said that these deposits into trust accounts, investor trust accounts, were in substance the purchase price that U.S. investors were paying to acquire tranches of receivables so they could then use the built-in losses to claim substantial losses on their tax returns. These trust transactions were effective using the same foreign documents, the same structure. Funds were deposited into the same bank accounts. Nothing in substance is different for the 2006 to 2008 years than it was in the 2004 to 2005 years. The result is the same. Although this was nominally a trust relationship, Sugar Loaf had access to these funds, used these funds to benefit itself. None of these funds were ever returned to the U.S. investors. This is, in substance, the payment for a tranche of receivables. It is income to Sugar Loaf and, therefore, allocated to Jetstream. And then turning to the issue of deductions, we would note that this court has repeatedly held that transactions that lack economic substance are not recognized for tax purposes. That's what this court said in Feldman, what it said in Muich, what it said in Superior Trading, what it said in Sugar Loaf 1, that transactions that lack economic substance are not recognized for tax purposes. The necessary corollary of that rule, as recognized by the 3rd, 5th, and 11th circuits explicitly, is that a deduction that an expense incurred in support of a transaction lacking economic substance is also not deductible. By analogy, if a taxpayer was engaged in the construction industry and wanted to avail itself of credits for engaging in new construction, and what it did was it went out and said, we're not actually going to do the construction, we just want to get these credits. What we're going to do is we're going to pay someone to take a backhoe and dig big holes in the ground and then fill them back in. We're going to create the appearance that we are doing construction without actually doing the construction. We would submit that the costs, the expenses, of digging these holes and filling them back in would not be deductible because there's not a real business transaction. There's not a real construction business. Similarly here, the costs and expenses related to debt collection are mere window dressing. And because there is no actual debt collection business, the corollary is that there cannot be any deductions allowed in support of that nonexistent business. And in any event, there are clear substantiation problems, as the tax court noted, where there are, you know, the example we gave in our briefing is the consulting fees that were supposedly incurred in 2006 in connection with the debt collection enterprise, where there are two sets of QuickBook entries that have different numbers on them. Sugarloaf's tax return picks a number in the middle of those two QuickBook entries, and Mr. Rogers at trial was unable to explain that discrepancy. And then finally, the issue of Sugarloaf's basis in the Globex receivables. The issue is that, again, Sugarloaf has to substantiate what that number is. It has to show that it has a basis greater than zero. In Kenna Trading, the court explicitly found that Sugarloaf had not done that, had not established a basis greater than zero. On appeal, Mr. Sugarloaf's opening and reply briefs do not cite to anything specific in the record backing up the number that it's seeking, $1,950,000. It does not point to any support in the record for this number. It instead says, look at the entire record of Kenna Trading, which is several thousand pages. But this court is not obligated to try to dig through thousands of pages in order to come up with a number that's put in Sugarloaf's brief. And we would just note in passing that the $1,950,000 number that Sugarloaf is now advancing on appeal is different than the number that Sugarloaf advanced below. In its opening post-trial brief at page 40, Sugarloaf said that its basis, its purchase price, and these receivables was $950,000, not $1,950,000. And reiterated that position in its reply brief at pages 26 and 27. Not only is Sugarloaf not substantiating the number that it's seeking, it can't even agree on that number on its own. If there are no further questions, we would ask that the task force decision be affirmed. Thank you. Mr. Rogers, you have a little over a minute. Your Honor, I disagree vehemently that Sugarloaf did, in fact, have collections at page, at Exhibit 920. There is a schedule on Sugarloaf collections, July 30, 2003, or November 1, 2003 to July 30, 2007. And this is before the changes in management. There were $2,319,000 in collections on the supposedly useless receivables. With respect to the changes in management, that's the key thing to a business is changing the management, and that's what we did, a great effort. Your time has expired. Thank you. Our thanks to both counsel. The case is taken under advisement.